# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 05-CV-4324 (JFB) (AKT)

_____

THOMAS MAC INEIRGHE AND EILEEN MAC INEIRGHE,
INDIVIDUALLY, AND AS THE PARENTS AND NATURAL GUARDIANS OF I.M.,

Plaintiffs,

VERSUS

BOARD OF EDUCATION OF THE EAST ISLIP UNION FREE SCHOOL DISTRICT,
RHEA WARREN, JOHN E. FLYNN, AND DEBORAH Y. SMITH,

Defendants.

_____

MEMORANDUM AND ORDER
August 22, 2007

_____

JOSEPH F. BIANCO, District Judge:

Plaintiffs Thomas and Eileen Mac Ineirghe brought this action individually and on behalf of their son, I.M. (hereinafter, "plaintiffs"), against defendants Board of Education of the East Islip Union Free School District ("the Board of Education"), Rhia Warren ("Principal Warren"), John E. Flynn ("Flynn"), and Deborah Y. Smith ("Smith").

This lawsuit arises out of searches of I.M. on September 23, 2004 by administrators at East Islip High School, while I.M. was a tenth-grade student at the school. The searches consisted of a vital signs check by the school nurse, a search of I.M.'s person and bags, an initial saliva drug test, and three subsequent saliva drug tests later that same day. Defendants conducted the searches based upon their suspicion that I.M. was using, or in possession of, drugs and therefore argue, among other things, that the searches were justified under the Fourth Amendment.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56 on all claims. For the reasons that follow, defendants' motion is granted in part and denied in part. Specifically, with the exception of the Fourth Amendment and state battery claims against the individual

defendants as it relates to the three subsequent drug tests of I.M. later in the day on September 23, the Court grants the summary judgment motion on all other claims.

## I. BACKGROUND

### A. FACTS

The facts described below are taken from the parties' depositions, declarations, affidavits, exhibits and respective Local Rule 56.1 statements of facts.[1] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2001).

At the time of the complained-of incidents, I.M. was a tenth-grade student at East Islip High School ("East Islip"). (Plaintiff's Local 56.1 Statement of Material Facts ("Pls.' 56.1"), ¶ 1.)[2] On September 23, 2004, at approximately 10:35 a.m., I.M. and another student, K.B., were in the school parking lot during school hours, which was not allowed. (*Id.* ¶ 3; I.M. Aff. ¶ 3.) Defendant Flynn, who was head of security for East Islip, saw the two students on the security cameras; the students were running out of the gym doors to the parking lot. (Flynn Dep. at 32-33.) Flynn testified that he then went outside after the boys. (Flynn Aff. at 35.) According to I.M., a security guard was at the school entrance waiting for the boys when they returned, and the security guard told them to wait while he went to get Flynn, the head of security. (I.M. Dep. at 40-44.) The boys were outside for approximately one to three minutes. (Flynn Dep. at 37; I.M. Aff. ¶ 3.) According to Flynn, the boys hid when they saw him. (Flynn Aff. at 36.) Plaintiff, however, denies ducking and hiding

---

[1] As plaintiffs' point out, defendants failed to comply with Local Civil Rule 56.1. Though defendants provided a statement of facts, identified as a Local 56.1 Statement, defendants failed to list separately numbered paragraphs to which plaintiffs could readily respond. "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see, e.g., Gilani v. GNOC Corp.*, No. 04-CV-2935 (ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Rule 56.1). Here, although defendants did not separately number their paragraphs, both the 56.1 statement and defendants' other moving papers cite to relevant parts of the record, attached as exhibits to their papers, in support of their motion. Thus, both the opposing party and the Court are aware of the portions of the record upon which the defendants rely in support of their motion, and plaintiffs have not identified any prejudice arising from the defendants' defect in their 56.1 statement. Accordingly, in the exercise of its broad discretion, the Court will not deny defendants' motion based upon their technical failure to adhere to Local Civil Rule 56.1. *See Photopaint Tech., LLC v. Smartlens Corp.*, 335 F.3d 152, 156 n.2 (2d Cir. 2003) (excusing failure to comply with Local Civil Rule 56.1 where the relevant facts were apparent from the parties' submissions and there was no evidence of prejudice from the defect); *Williams v. R.H. Donnelley, Inc.*, 199 F. Supp. 2d 172, 174 n.1 (S.D.N.Y. 2002) (excusing failure to submit statement pursuant to Local Civil Rule 56.1 where the facts were set forth in the party's memorandum of law, to the extent that the other requirements of the rule were also met).

[2] Where only one party's 56.1 statement is cited, the other party does not dispute the facts alleged, or there is no evidence controverting such fact, unless otherwise noted.

between cars to avoid detection. (I.M. Dep. at 37.) Flynn escorted I.M. and K.B. to the office of defendant Warren who was the principal of East Islip Union Free School District (hereinafter "the District"). (Pls.' Aff. ¶ 4.)

According to Principal Warren, when the students were brought in, I.M. appeared very nervous and agitated. (Warren Aff. ¶ 3.) In particular, according to Principal Warren, I.M. repeatedly wiped his nose and rubbed his eyes, and the other student's eyes were red, and the student kept putting Visine into them. (*Id.*) Principal Warren also stated that, when she asked the other student what he had been doing that made his eyes red, he blurted out that he does not smoke "weed." (*Id.*) Principal Warren was also informed by security that I.M. had attempted to flee, rather than come to the Principal's Office as directed. (*Id.* ¶ 4.) According to plaintiff at his deposition, although he was wiping his nose and rubbing his eyes in the Principal's Office, he was doing so because he was sick (but did not advise anyone of any illness at the time). (I.M. Dep. at 125-26.) Plaintiffs admit that I.M. was nervous, but contend that I.M. was not highly agitated and his eyes were not red. (Pls.' 56.1 ¶ 6.)

According to Principal Warren, based upon the boys' suspicious behavior, including I.M.'s nervous state, she had cause to believe that I.M. was under the influence of illegal drugs and, thus, decided to follow the District's established procedure regarding students believed to be using drugs. (Warren Aff. ¶ 5.) First, Principal Warren directed the school nurse to take I.M.'s blood pressure, which was elevated at 160/80, and his pulse, which was also elevated at 120. (*Id.* ¶ 7.) The school nurse also noted that I.M.'s pupils were slightly constricted, but equal and reactive. (Veryzer Dep. at 23.) Although I.M. had a slightly elevated pulse and blood pressure and constricted eyes, the nurse concluded his vital signs were within normal parameters and saw nothing specifically demonstrating drug use. (*Id.* at 15-17.)

Principal Warren then had I.M. and K.B. searched and tested for drugs. (Pls.' 56.1 ¶ 7.) The search included I.M.'s book bag, shoes, and pockets. (*Id.* ¶ 8.) No drugs were found on I.M. (*Id.* ¶ 9.) Thereafter, Flynn administered a drug test using an oral, saliva-based drug screening kit. (*Id.* ¶ 12.)

K.B. tested positive.[3] (Pl.'s Dep. at 83-84.) There is a dispute regarding the circumstances and results of I.M.'s initial saliva test. According to defendants, the results of the test were void because I.M. frustrated the validity of the test by sucking and biting on the test wand. (Warren Aff. ¶ 15.) I.M., however, states that he was fully compliant during the test and that he was told by Principal Warren that he had passed the test. (I.M. Aff. ¶ 7.) Warren denies telling I.M. that he had passed the test. (Warren Aff. ¶ 16.) Instead, Warren stated that, due to I.M.'s very nervous demeanor, she sent him back to class around 11:15 a.m. in the hope that he would calm down. (*Id.* ¶ 17.)

---

[3] In plaintiffs' 56.1 Counter Statement, plaintiffs do not admit that K.B. tested positive, and instead state that such information is unknown as "[neither] the records nor the testing implement has been furnished plaintiffs [sic] or the court." (Pl.'s 56.1, ¶ 15.) However, when I.M. was asked in his deposition whether K.B. tested positive for drugs, I.M. testified that K.B. "came up for something." (Pl.'s Dep. at 83; *see also id.* at 86, 94.)

I.M. then went to see the Assistant Principals, who told him that he was going to receive a one-day in-school suspension for going outside, and sent him back to class. (I.M. Aff. ¶ 8.)

Later that day, at approximately 12:45 p.m., I.M. was taken out of class and, at Principal Warren's direction, three more saliva drug tests were administered by Flynn. (*Id.* ¶ 9.) According to Principal Warren, a remark by the other student at some point – namely, "How could he [*i.e.,* I.M.] come up negative?" – gave her additional reason to believe that I.M. had been using a prohibited substance. (Warren Aff. ¶ 18.) Principal Warren stated that, during each of the three subsequent saliva tests, I.M. deliberately mangled each test by biting and chewing on the swab, despite direction not to do so and, therefore, each test was rendered void. (*Id.* ¶ 19.) According to I.M., he cooperated fully during each of the drug tests. (I.M. Aff. ¶ 9.) Principal Warren attempted to give I.M. a fifth drug test, but I.M. refused. (I.M. Aff. ¶ 10.) I.M.'s father was contacted and arrived soon thereafter, accompanied by I.M.'s brother. (*Id.* ¶ 10; Warren Aff. ¶ 26.)

I.M. was extremely upset and I.M. regained control of his conduct after his father, Mr. Mac Ineirghe, struck him in the face.[4] (Pls.' 56.1 ¶ 21; Warren PINS

---

[4] According to Principal Warren, the following interactions with I.M. took place during this subsequent testing:

> [I.M.] remained agitated throughout the process. I told [I.M.] that I wanted to be able to rule out drug use, and call his father to inform him that [I.M.] was all right. At this point, [I.M.] became extremely irate and threatening towards

Testimony at 18.) As a result of I.M.'s conduct, he was suspended for five days. (Pls.' 56.1 ¶ 22.) Upon return from the suspension, on October 1, 2004, I.M. was placed in an in-school suspension class for the day. (I.M. Aff. ¶ 15.) He returned to his regular classes the following school day, which was a Monday. (*Id.*) Plaintiffs challenged the suspension and the reasons for the suspension by appeal to the Commissioner

---

> me. He yelled that he would not stay in may office, screaming that I was a "f***ing idiot!" He repeated this phrase several times. [I.M.] also referred to me as "f***ing stupid," a "f***ing b****," and "a moron." . . . [I.M.] kept standing up and sitting down, flailing his arms, and yelling strenuously. His behavior was menacing. [I.M.] is at least my height, and has a medium to heavy build. I felt physically threatened by his behavior. . . . Despite my repeated directions and Mr. Flynn's repeated directions to calm down, [I.M.] continued to shout vulgarities and attempt to leave. At this point, I called Mr. MacIneirghe [sic] regarding [I.M.'s] volatile behavior. Mr. MacIneirghe arrived at school very quickly, accompanied by an older son. Despite Mr. MacIneirghe's arrival, [I.M.] continued to yell and curse at the top of his lungs. Mr. MacIneirghe directed [I.M.] to sit down and be quiet. [I.M.] loudly told his father "No" and continued his abusive conduct. Mr. MacIneirghe was unable to either calm [I.M.] or even get [I.M.] to restrain himself. Eventually, Mr. MacIneirghe slapped his son. At this, [I.M.] quieted somewhat, although not completely.

(Warren Aff. ¶¶ 21-27.) Although plaintiffs concede that I.M. was extremely upset, I.M. denies that he threatened or cursed at Principal Warren. (I.M. Aff. ¶ 12.)

of Education. (Pls.' 56.1 ¶ 23.) The appeal is still pending. (*Id.*)

I.M. was later referred by the District's mental health professionals to the Family Court's Persons In Need of Supervision ("PINS") program. (*Id.* ¶ 25.) This referral led to a hearing in Family Court, Suffolk County, which took place over the course of several days. (*Id.* ¶ 26.) Numerous witnesses, including I.M. and the other parties to the present lawsuit, gave testimony regarding I.M.'s behavior leading up to his suspension and the day he returned from his suspension. (*Id.* ¶ 27.) The court, sitting as the factfinder, weighed the testimony of the various witnesses. (*Id.* ¶ 28.) The court concluded that I.M. was a "Person in Need of Supervision." (*Id.* ¶ 30.) Plaintiffs appealed the determination to the Appellate Division, Second Department. (*Id.* ¶ 32.) On October 24, 2006, the Appellate Division rendered a decision and order affirming the disposition of the Family Court. (Pls.' Ex. N.)

## B. PROCEDURAL HISTORY

This case was removed from state court on September 13, 2005. On March 31, 2006, this case was re-assigned from the Honorable Arthur D. Spatt to the undersigned. On November 20, 2006, defendants filed the instant motion for summary judgment. Oral argument was held on December 22, 2006. At oral argument, the Court granted plaintiffs an opportunity to amend their complaint to clarify their claims and issued a schedule for supplemental briefing on defendants' motion. Pursuant to that schedule, plaintiffs filed the amended complaint on January 4, 2007. Supplemental briefing was completed on February 9, 2007.

## II. STANDARD OF REVIEW

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

### III. DISCUSSION

Defendants make several arguments in support of their summary judgment motion: (1) plaintiffs' claims are barred by the doctrines of *res judicata* and collateral estoppel because of the prior litigation in Family Court regarding the PINS petition; (2) plaintiffs' Fourth Amendment claims must be dismissed because the searches of I.M. by the defendants were reasonable as a matter of law; (3) even if there is a material issue of fact as to the reasonableness of the searches, summary judgment is warranted under the doctrine of qualified immunity; (4) plaintiffs' due process claim cannot survive summary judgment because plaintiffs did not exhaust their administrative remedies and, in any event, such claim must fail because sufficient process was provided to plaintiffs as a matter of law; and (5) there is no private right of action with respect to plaintiffs' claim under New York Education Law. The Court will address each of these issues in turn.

### A. *Res Judicata* and Collateral Estoppel

Defendants argue that plaintiffs' complaint must be dismissed on the grounds of *res judicata* and collateral estoppel because their claims and the issues raised in their complaint were decided in the Family Court decision that was rendered in connection with the PINS petition and hearing. As set forth below, the Court finds this argument unpersuasive.

The doctrine of *res judicata*, otherwise known as claim preclusion, prevents parties from re-litigating issues in subsequent litigation that were or could have been litigated in a prior action. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980). "In applying the doctrine of *res judicata*, [a court] must keep in mind that a state court judgment has the same preclusive effect in federal court as the judgement would have had in state court." *Burka v. N.Y.C. Transit Auth.*, 32 F.3d 654, 657 (2d Cir. 1994). New York courts apply a transactional analysis of *res judicata*, "'barring a later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief.'" *Id.* (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). The doctrine applies only if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284-85 (2d Cir. 2000) (citations omitted).

However, "[b]ecause *res judicata* does not apply to a § 1983 claim for damages where the previous litigation did not involve damages, the question is whether the

plaintiff[s'] claims are barred by collateral estoppel." *Velez v. Reynolds*, 325 F. Supp. 2d 293, 305 (S.D.N.Y. 2004) (citing *Phifer v. City of New York*, 289 F.3d 49, 56 (2d Cir. 2002)). "In determining whether an issue is barred in the federal action, courts must apply the collateral estoppel rules of the state in which the prior decision was rendered." *Providencia V. v. Schutlze*, No. 02-CV-9616 (LTS), 2007 U.S. Dist. LEXIS 39980, at * 11 (S.D.N.Y. May 31, 2007) (citing *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000)). Collateral estoppel, also known as issue preclusion, applies under New York law if "(1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom issue preclusion is asserted had a full and fair opportunity to litigate the issue in the first proceedings." *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 94 (2d Cir. 2005) (internal quotation marks omitted). "The party seeking the benefit of collateral estoppel bears the burden of proving the identity of the issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues." *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir. 1991) (citing *Kaufman v. Eli Lilly & Co.*, 482 N.E.2d 63, 67 (N.Y. 1985)).

In the instant matter, the Second Department found that "the petition was based upon, *inter alia*, the appellant's outburst in the principal's office and his refusal to behave in the in-school suspension room, not upon his refusal to comply with an allegedly improper drug test or search." *East Islip High School v. Ian M.*, 824 N.Y.S.2d 305, 306 (N.Y. App. Div. 2006). Thus, to the extent plaintiffs are continuing to challenge the PINS referral in this litigation, that issue was actually and necessarily decided by the Family Court and

affirmed by the Second Department, and plaintiffs had a full and fair opportunity to present their claims in that proceeding. However, plaintiffs argue that the issues raised in their amended complaint – wrongful search, physical examination and four drug tests – are issues that were *not* litigated and determined in the PINS proceeding. (Pls.' Mem. at 2.) The Court agrees.

When a plaintiff brings a § 1983 action in federal court that challenges the constitutionality of a state official's conduct after a family court has already passed on related issues, the federal court must carefully analyze the individual claims in light of the family court's ultimate findings of fact and legal conclusions and the information that was presented to it. *See, e.g.*, *Park v. City of New York*, No. 99-CV-2981 (LBS), 2003 U.S. Dist. LEXIS 578, at *28 (S.D.N.Y. Jan. 16, 2003) (applying this standard, as announced in *Phifer*, 289 F.3d at 57, where parents challenged child removal and neglect proceedings). Here, the Family Court was presented with the facts of the underlying incidents, including testimony of witnesses regarding the search and drug testing. This testimony was summarized in the Family Court's decision, judgment, and order dated October 25, 2005. Defendants argue that, because plaintiffs advanced facts regarding the search of I.M.'s person and bag, as well as the nurse's examination and drug testing in support of a justification defense in the PINS hearing, plaintiffs had a full and fair opportunity to litigate the issues, which were allegedly decided by the Family Court when it rejected the defense. This Court disagrees. The Family Court did not rule on or address the legality or constitutionality of the search of I.M.'s person and bag, the nurse exam, or the drug tests. Though information regarding these actions was presented to the Family

Court, the court did not make factual findings or legal conclusions regarding the legality of such actions. Instead, the opinion states:

> The Court is constrained to note that, although the primary thrust of the Respondent's defense seems to revolve around a theory that this PINS Petition is a punishment for the alleged use of illicit drugs, no such allegations are contained within the Petition. Moreover, the evidence adduced clearly shows that the actions taken by the Petitioner were not premised upon any alleged drug use by the Respondent, but rather due to his incorrigibility and his failure to attend classes as required by the Education Law. Indeed, all the references to alleged drug use were raised by Respondent's counsel, and were not part of Petitioner's direct case.

(Defs.' Ex. C at 4.) In light of the Family Court's findings of fact and legal conclusions, this Court finds that the Family Court did *not* pass upon the issues of the constitutionality of the search of I.M., the nurse's examination and the drug testing. Though some of the relevant facts were presented to the court, the court did not determine those operative facts, as it concluded that they were not relevant to the PINS Petition before it. Accordingly, plaintiffs' Fourth Amendment claims are not barred by *res judicata* or collateral estoppel.

## B. Fourth Amendment Claims

Defendants argue that they are entitled to summary judgment because the undisputed facts establish that the searches of I.M. were reasonable as a matter of law under the Fourth Amendment. As set forth below, analyzing the claims under the standard established by the United States Supreme Court for searches of students in school, this Court concludes that plaintiffs have failed to raise a material issue of fact as to the reasonableness of the nurse's examination, the search of I.M.'s person and bags, and the initial saliva test. However, with respect to the three subsequent drug tests on that same day, viewing the evidence most favorably to plaintiffs, there are disputed issues of fact that preclude summary judgment on the Fourth Amendment claim.

It is axiomatic that the "[Fourth] Amendment's prohibition against unreasonable searches and seizures applies to searches conducted by public school officials." *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985). However, it is also well-settled that "'while children assuredly do not shed their constitutional rights . . . at the schoolhouse gate, . . . the nature of those rights is what is appropriate for children in school.'" *Morse v. Frederick*, 127 S. Ct. 2618, 2627 (2007) (quoting *Veronica Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995) (internal quotations omitted)) (omissions in original). Thus, "the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject." *T.L.O.*, 469 U.S. at 340. Specifically, "school officials need not obtain a warrant before searching a student who is under their authority." *Id.* Moreover, the "special needs" of the public school environment do not require strict adherence to the probable cause requirement:

> [T]he accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require

8

strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search.

*T.L.O.*, 469 U.S. at 341; *see also Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 829 (2002) ("'[S]pecial needs' inhere in the public school context."); *Veronica,* 515 U.S. at 656 ("Fourth Amendment rights, no less than First and Fourteenth Amendment rights are different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children. For their own good and that of their classmates, public school children are routinely required to submit to various physical examinations, and to be vaccinated against various diseases.").

The *T.L.O.* Court established a two-part inquiry to determine whether a search is reasonable in the school setting: "first, one must consider 'whether the . . . action was justified at its inception[;]' . . . second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place.'" 469 U.S. at 341 (quoting *Terry v. Ohio*, 392 U.S. at 20.)) The Court noted:

> Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating

either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*T.L.O.*, 469 U.S. at 341-42 (footnotes omitted).

Thus, under *T.L.O.*, a search will ordinarily be justified at its inception if it is supported by reasonable suspicion.[5] "The requirement of reasonable suspicion is not a requirement of absolute certainty but only of sufficient probability." *Phaneuf v. Fraikin*, 448 F.3d at 596.

---

[5] As noted *infra*, *T.L.O.* made clear that it was not deciding whether individualized suspicion was necessarily required for the search at issue there, but rather found that such suspicion existed and was sufficient to satisfy the Fourth Amendment. 469 U.S. at 342 n.8. Moreover, the Supreme Court has upheld searches in schools in certain other contexts even absent particularized suspicion. *See e.g.*, *Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002) (upholding the constitutionality of suspicionless urinalysis drug testing policy of students participating in extracurricular activities). However, analyzing the factual circumstances in the instant case, the Court concludes that it is appropriate to apply the "reasonable suspicion" standard. *Phaneuf v. Fraikin*, 448 F.3d 591, 596 (2d Cir. 2006) ("*T.L.O.* held that reasonable suspicion is the governing standard . . . ."); *see also Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993) ("[A] search is warranted only if the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation.").

With respect to the government interest at issue, the *T.L.O.* Court noted that "because drug use and possession of weapons have become increasingly common among young people, an immediate response frequently is required not just to maintain an environment conducive to learning, but to protect the very safety of students and school personnel." *T.L.O.*, 469 U.S. at 352-53. In fact, the Supreme Court has explained in detail the strong interest schools have in combating and preventing drug use by students:

> That the nature of the concern is important – indeed, perhaps compelling – can hardly be doubted. Deterring drug use by our Nation's schoolchildren is at least as important as enhancing efficient enforcement of the Nation's laws against the importation of drugs. . . . School years are the time when physical, psychological, and addictive effects of drugs are most severe. . . . And of course the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty, as the educational process is disrupted.

*Veronica,* 515 U.S. at 661-62 (citations omitted). In 2002, in *Earls*, the Supreme Court noted: "The drug abuse problem among our Nation's youth has hardly abated since *Veronia* was decided in 1995. In fact, evidence suggests that it has only grown worse." 536 U.S. at 834 n.5. Moreover, as recently as a few months ago, in *Morse*, Chief Justice Roberts cited the conclusions of *Veronia* and *Earls* regarding the drug abuse problem in our Nation's schools and reiterated that "[t]he problem remains serious today." *Morse*, 127 S. Ct. at 2628. Therefore, there is no question that schools continue to have a strong, if not compelling interest, in ensuring that their students are not using drugs.

The Court, applying this legal standard, will now examine the evidence in the record regarding the various searches of I.M. by the defendants on September 23, 2004.

### 1. Nurse's Examination, Search, and Initial Drug Test

Plaintiffs allege a Fourth Amendment violation stemming from the nurse's examination of I.M., the search of I.M.'s person and bag, and the initial saliva test. Plaintiffs do not dispute that I.M. and the other student, K.B., left the school building in violation of the school rules and were seen in the parking lot. (I.M. Aff. ¶ 3.) After getting caught leaving the school building and entering the parking lot for a couple of minutes, Flynn escorted the boys to principal Warren's office. (*Id.* ¶ 4.) It is also undisputed that I.M. was nervous (Pl.'s 56.1 ¶ 6), and that he was wiping his nose and rubbing his eyes in the Principal's office without giving a reason.[6] (I.M. Dep. at 125-

---

[6] I.M. gave the following testimony at this deposition:

> Q. What kinds of things was [Principal Warren] saying to you when you went back to the secretary's office?
>
> A. She was making like all these remarks about like the drugs and everything. Like she was saying I was wiping my nose and rubbing my eyes and stuff.
>
> Q. Had you been?
>
> A. Yes.
>
> Q. You had been wiping your nose and

27.)

At Principal Warren's request, the nurse took the vital signs of I.M. and K.B. (Pls.' 56.1 ¶ 11; Veryzer Dep. at 14.) Specifically, she took I.M.'s blood pressure and pulse, observed his general appearance and looked at his eyes. (Veryzer Dep. at 14, 23.) Plaintiffs contend that this examination by the nurse was not justified and was a violation of I.M.'s Fourth Amendment rights.

I.M. cooperated with the nurse when she took his vital signs. (*Id.* at 15.) She found that, though I.M. had a slightly elevated pulse, I.M.'s vital signs were within "normal parameters." (*Id.* at 16.) She also noted that there was slight constriction of his pupils and that his eyes were equal and reactive. (*Id.* at 23-24.) Despite the elevated pulse, the nurse stated that she did not notice anything that would specifically indicate that I.M. was using drugs at the time. (*Id.* at 17.)

---

rubbing your eyes?

A. Yes.

Q. Was there a reason?

A. I was sick then and then – it was at that point where it was just so stressful like that you just start rubbing your eyes because they were watering and everything.

\* \* \*

Q. Did you tell anybody else that you were sick?

A. No.

(I.M. Dep. at 125-27.)

After the nurse examined I.M.'s vitals, the security officer took I.M. to a curtained area in the nurse's office and instructed him to empty his pockets and remove his shoes. (I.M. Aff. ¶ 6.) The security officer then patted down I.M.'s pockets and carefully searched I.M.'s book bag. (*Id.*) No drugs were found on I.M.'s person or in his bag. (*Id.*; Pls.' Ex. W.) According to Principal Warren, based on K.B. and I.M.'s behavior and their vitals, she asked the security officer to give them a drug test. (Warren Dep. at 41.) An oral, saliva-based drug test was administered. (Pls.' 56.1 ¶ 12.)

As set forth below, the Court finds that the checking of I.M.'s vital signs, the search of I.M.'s bag and shoes, pat down of his pockets, and the administration of the saliva based drug test were justified at their inception, and were not excessive or intrusive.

"[A] search is warranted only if the student's conduct creates a reasonable suspicion that a particular regulation or law has been violated, with the search serving to produce evidence of that violation." *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993). Moreover, the court must review "the totality of the circumstances, looking first at those that might have created a reasonable suspicion that such a search was justified at its inception" and must base that review "on only those facts known to the school officials *prior* to the search." *Phaneuf*, 448 F.3d at 597 (footnote omitted) (citations omitted).

Given the undisputed facts known by the school administrators at the time of search, the initial searches were justified at their inception. Specifically, although plaintiffs contest many aspects of I.M.'s conduct and appearance on the date in question, it is

undisputed that I.M. and the other student were found in the school parking lot during school hours in violation of school rules, that they appeared nervous, and that I.M. was wiping his nose and rubbing his eyes. Based on these undisputed facts, Principal Warren had reasonable suspicion that I.M. had gone into the parking lot, against school rules, to use drugs and thus, that I.M. either had drugs in his possession or had used drugs while outside. Thus, the searches were supported by reasonable suspicion and were justified under the Fourth Amendment at their inception.

Plaintiffs cite *Phaneuf v. Fraiken*, to support their argument that the search was not justified at its inception. However, the facts of *Phaneuf* are markedly different from this case, in that *Phaneuf* involved a strip search of a student. 448 F.3d at 598. The Second Circuit noted that "[a]lthough *T.L.O.* held that reasonable suspicion is the governing standard, the reasonableness of the suspicion is informed by the very intrusive nature of a strip search, requiring for its justification a high level of suspicion." *Id.* at 596 (citing *N.G. v. Connecticut*, 382 F.3d 225, 234 (2d Cir. 2004)). The Court held that the highly intrusive strip search was not justified at its inception. 448 F.3d at 600. Unlike *Phaneuf*, the level of intrusiveness of the nurse's examination, search of I.M.'s bag, pat down of I.M.'s pockets and initial saliva-based drug test did not require a *high* level of suspicion, only a reasonable suspicion – which existed here based on the undisputed facts.

Thus, the Court turns to the question of whether the searches were reasonable in scope and not excessively intrusive. The Court concludes that, due to their minimally invasive nature, the vital signs check, bag check, pocket pat-down, and initial saliva-based drug test were reasonably related to

their objectives of determining whether I.M. had used or was intending to use drugs in the school parking lot and were not excessively intrusive. None of the searches involved intruded upon I.M.'s privacy rights to such an extent that a constitutional violation occurred.

The performance of the minor medical examination in the form of a vital signs check involved limited contact and was reasonable in scope. *See, e.g., Hedges v. Musco*, 204 F.3d 109, 117 (3d Cir. 2000) (holding that nurse's "vital signs" examination, a urinalysis and a blood test, did not constitute unreasonable searches where the student had exhibited uncharacteristic behavior and appearance consistent with the possible use of drugs); *Bridgman v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146, 1149 (7th Cir. 1997) (holding that "symptoms were sufficient to ground [teacher's] suspicion, and the medical assessment was reasonably calculated to uncover further evidence of the suspected drug use" where student was "giggling and acting in an unruly fashion, " had dilated and bloodshot eyes and provided "flippant" answers).

Similarly, the physical search of I.M.'s person and bag for drugs was reasonable under the circumstances of this case. The search was limited to I.M.'s shoes, pockets and book bag. Defendants believed that I.M. had left the school building to use drugs; thus, a basic search of I.M.'s person and bag was directly related to that suspicion. Furthermore, courts have upheld far more invasive searches, including strip searches. For example, in *Cornfield v. Consol. High Sch. Dist. No. 230*, plaintiff, who had a history of disciplinary problems, had been caught outside the school building in violation of school rules, and a bulge was observed in the student's pants. 991 F.2d at 1319. The

following day, believing plaintiff was "crotching" drugs, the defendants strip-searched the student though plaintiff's mother denied her consent to a search. *Id.* Recognizing that "[w]hat may constitute reasonable suspicion for a search of a locker, or even a pocket or pocketbook may fall well short of reasonableness for a nude search," the Seventh Circuit held that the search was reasonable. *Id.* at 1321-23. Thus, the limited search that was involved in the instant action did not rise to the level of a Fourth Amendment violation. *See also Rhodes v. Guarricino*, 54 F. Supp. 2d 186, 192-93 (S.D.N.Y. 1999) (finding no Fourth Amendment violation where defendants searched students' hotel rooms after smelling marijuana around students outside of one of their rooms).

The initial saliva-based drug test was also reasonable under the circumstances. Courts have upheld both urinalysis and blood tests as reasonable. *See, e.g.*, *Hedges*, 204 F.3d at 119-120 (holding that urinalysis and a blood test of a student did not constitute unreasonable searches) (citing *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 625 (1989) ("[T]he intrusion occasioned by a blood test is not significant."); *Winston v. Lee*, 470 U.S. 753, 762 (1985) ("[S]ociety's judgment [is] that blood tests do not constitute an unduly extensive imposition on an individual's personal privacy and bodily integrity."); *South Dakota v. Neville*, 459 U.S. 553, 563, (1983) ("The simple blood-alcohol test is . . . safe, painless, and commonplace."); *Breithaupt v. Abram*, 352 U.S. 432, 436 (1957) ("The blood test procedure has become routine in our everyday life.")); *see also Rinker v. Sipler*, 264 F. Supp. 2d 181, 190 (M.D. Pa. 2003) (holding that plaintiff's Fourth Amendment rights were not violated where defendants monitored the collection of

a urine sample, splashed water on the student's neck from behind and had the student splash water on his wrists). A saliva-based drug test is a far less invasive search than either a urinalysis or blood test. Here, the test involved placing a stick in I.M.'s mouth. This level of intrusion on I.M.'s privacy and bodily integrity is minimal. Furthermore, that defendants did not seek or receive parental consent to perform the drug test is of no consequence, as lack of consent does not negate a reasonable search. *See Hedges*, 204 F.3d at 121 n.13 ("Because we conclude that the search was reasonable, we need not reach the . . . defendants' argument that plaintiffs consented to the search."); *Gutin v. Washington Township Bd. of Educ.*, 467 F. Supp. 2d 414, 425 (D.N.J. 2006) ("The presence of consent is one way of establishing a reasonable search but its absence does not automatically render a search unreasonable."). Accordingly, the Court finds that defendants actions in performing a saliva-based drug test were reasonable.

Finally, contrary to plaintiffs' assertion, the fact that the vitals signs check did not conclusively indicate drug use does not require denial of defendants' motion for summary judgment on the subsequent search of his person and bag, as well as the drug test. This Court agrees with the reasoning of *Rinker v. Sipler*, where the court held that escalating searches are not the *only* types of searches that are deemed permissible in the school context. 264 F. Supp. 2d at 186. Specifically, the court concluded that, though *T.L.O.* and *Hedges* upheld the constitutionality of escalating searches, "they did not hold that such searches are the *only* searches that are constitutionally permissible[;]" instead a search "is to be evaluated by the totality of circumstances." *Id.* (emphasis added). Thus, the results of the

vital signs check do not transform the subsequent search and drug test into unconstitutional acts as a matter of law; rather, the Court must examine the totality of the circumstances and the nature of the searches involved.

In the instant case, the vital signs check indicated an elevated pulse. Although the vital signs were certainly not conclusive proof of drug use (and were considered within normal parameters) and the nurse observed nothing to necessarily indicate drug use based on the vital signs, the results of the test certainly did not dissipate the reasonable suspicion and make the subsequent search of I.M.'s person/bag and the saliva test unjustified. In other words, the reasonable suspicion that existed at the time of the vital signs check, along with I.M.'s elevated pulse, provided sufficient basis to proceed with the search of I.M. and his belongings and to perform the saliva test. Similarly, the fact that the search of I.M.'s person and belongings did not uncover evidence of drug possession or use did not make the saliva test unjustified. A student using drugs outside the school building could easily finish or dispose of the drugs prior to being discovered by school officials. In other words, the failure of a student to have drugs in his or her possession is not necessarily inconsistent with recent drug use. Therefore, under the circumstances of this case and the initial basis for the suspicion, nothing about the results of the vital signs check or physical search rendered the saliva test unjustified under the Fourth Amendment "reasonableness" standard.

In sum, based upon the *undisputed* facts present at the time of the vital signs check, the search of I.M.'s person and bags, and the initial saliva test, the defendants had reasonable grounds for suspecting that the searches would produce evidence of an infraction of a school rule or policy, including drug possession and/or use. This series of searches, which occurred in the same time frame, were reasonable at their inception, were reasonably related to the objectives of the search, and were not excessively intrusive when balancing I.M.'s age in the context of the nature of the alleged infraction and defendants' strong interest in protecting the safety and welfare of its students, including preventing drug possession or use in the school. Accordingly, these searches were reasonable under the circumstances and did not violate I.M.'s Fourth Amendment rights. Thus, summary judgment as to plaintiffs' Fourth Amendment claims pertaining to these particular acts is warranted.

3. Three Subsequent Drug Tests

The Court must now turn to whether summary judgment is appropriate as to the three subsequent drug tests of I.M. later that day. The critical facts regarding I.M.'s conduct during the first drug test, the results of the first drug test, and the need for additional tests are clearly disputed. As set forth below, these disputed issues of material fact preclude summary judgment as to the reasonableness under the Fourth Amendment of the three subsequent tests.

With respect to the initial test, according to defendants, I.M. frustrated the test by biting on the wand used to administer the test and, therefore, the test was void. (Warren Dep. at 56.) I.M., however, asserts that he did not void the test and, after the first drug test was administered, he was told by Principal Warren that he passed:

Flynn, at Warren's direction, tested me for drugs. I did everything he

asked. I did not void the test. I passed the test. I know I passed because Warren said so. Warren said, "O.K. You passed. Good job. You're good to go. Go to your assistant principal and tell her what happened."

(I.M. Aff. ¶ 7.) Principal Warren disputes I.M's contention that she told him he passed; rather, she states that she sent him back to class in light of his nervous state. (Warren Aff. ¶¶ 16-17.)

Later that day, I.M. was taken out of class and, at Principal Warren's direction, three more drug tests were administered. (I.M. Aff. ¶ 9; Warren Aff. ¶ 19.) According to Principal Warren, the basis for the subsequent tests was the comment by the other student, K.B. – namely, upon learning that K.B. had tested positive and I.M. had not, K.B. stated: "How could he [I.M.] come up negative?" (Warren Aff. at ¶ 18; see also Defs.' Suppl. Mem. of Law at 6 ("Here, the information available to Principal Warren after IM left the nurse's office – i.e., the reason IM was tested again – stems directly from a remark made by KB, the other student found in the parking lot with IM and who tested positive for drug use.")). However, plaintiffs also dispute that the other student made this statement and, in support of their position, submit an affidavit by K.B. in which K.B. denies making any such remark to Principal Warren. (K.B. Aff. at 4.)

Finally, I.M.'s conduct during the three subsequent drug tests is similarly disputed. According to defendants, I.M. deliberately mangled each test and each was rendered void. (Warren Aff. ¶ 19.) However, I.M. asserts that he fully complied with the drug test procedures during each of the three subsequent drug tests. (I.M. Aff. ¶ 9.)

Principal Warren attempted to give I.M. a fifth drug test, but I.M. refused. (*Id.* ¶ 10.)

These disputed issues of fact are clearly material to the issue of "reasonableness" and require denial of defendants' motion for summary judgment on the Fourth Amendment claim relating to the subsequent drug tests. For purposes of this motion, the Court must view the facts in a light most favorable to plaintiffs. Thus, assuming I.M. fully complied with the first saliva test, the results were negative, and there was no new information to support additional testing, the three subsequent drug tests would not have been justified at their inception. In other words, if the initial drug test came back negative and no new information justified additional testing, there were not "reasonable grounds for suspecting" that three additional saliva-based drug tests would "turn-up evidence" that I.M. had violated the law. *T.L.O.*, 469 U.S. at 341-42. Thus, defendants' motion is denied as it relates to the three subsequent tests.

### 4. Municipal Liability

The Court has separately examined whether the School Board itself can be held liable for the alleged violations of the individual defendants. For the reasons set forth below, the Court concludes that summary judgment as to the Board of Education is warranted.

Municipalities, including school boards, cannot be held vicariously liable for the actions of an employee under § 1983. *Monell v. Dep't of Soc. Servs.*, 463 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a muncipality cannot be held liable under § 1983 on a respondeat

superior theory."). Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom 'officially adopted and promulgated by that [municipality's] officers.'" *Abreu v. City of New York*, No. 04-CV-1721 (JBW), 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quoting *Monell*, 436 U.S. at 690) (alteration in original). "[M]unicipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84 (1986)). Thus, an individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991). However, "[a] court may draw the inference of the existence of a policy or custom 'when a plaintiff presents evidence that a municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Caidor v. M&T Bank*, No. 05-CV-297 (FSJ), 2006 U.S. Dist. LEXIS 22980, at *35-*36 (N.D.N.Y. March 27, 2006) (quoting *Griffin-Nolan v. Providence Wash. Ins. Co.*, No. 04-CV-1453 (FJS), 2005 U.S. Dist. LEXIS 12902, *10 (N.D.N.Y. June 20, 2005) (quotation omitted)). But, "'the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Dwares v. City of New York*,

985 F.2d 94, 100 (2d Cir. 1993)).

Municipal liability may also be asserted based on a theory of failure to train. *Jenkins v. City of New York*, 478 F.3d 76, 9 (2d Cir. 2007). However, "'[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Id.* (quoting *City of Canton, Oh.*, 489 U.S. at 388). Here, plaintiffs have not adduced sufficient evidence to demonstrate that the events giving rise to this action occurred previously and there is no other evidence from which to indicate that the decision to drug test I.M. four times was part of a municipal policy or custom. Furthermore, plaintiffs do not allege, nor is there evidence of a "failure to train." Accordingly, plaintiffs' claims against the Board of Education are dismissed.[7]

---

[7] With the Court's permission, plaintiffs filed an amended complaint on January 4, 2007, to clarify their claims. In addition to adding and removing claims, the amended complaint added East Islip Union Free School District as a defendant. Plaintiffs allege to have done this in an "abundance of caution" in response to *Nichiporuk v. Bd. of Educ.*, 415 F. Supp. 2d 242 (W.D.N.Y. 2006). In that case, the Court stated, that "[t]o the extent [plaintiff] seeks damages the proper defendant is the . . . School District, not the Board of Education" and granted plaintiff leave to amend the complaint. *Id.* at 242 n.1. However, the claim against the School District fails for the same reasons that plaintiffs' claim of municipal liability against the Board of Education cannot survive summary judgment. Accordingly, plaintiffs' claim against the School District is dismissed.

### 5. Qualified Immunity for the Individual Defendants[8]

The individual defendants argue that, even if the searches of I.M. violated the Fourth Amendment, they are entitled to the defense of qualified immunity. "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have know.'" *Zellner v. Summerlin*, – F.3d –, 2007 WL 2067932, at *20 (2d Cir. July 20, 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003).

The Second Circuit has held that "a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal citations omitted).

In *T.L.O.*, the Supreme Court stated, "[w]e do not decide whether individualized suspicion is an essential element of the

reasonableness standard we adopt for searches by school authorities." 469 U.S. at 342 n.8. Specifically, the Court noted that "[b]ecause the search of T. L. O.'s purse was based upon an individualized suspicion that she had violated school rules, . . . we need not consider the circumstances that might justify school authorities in conducting searches unsupported by individualized suspicion." *Id*. Subsequently, recognizing a "special need," in *Veronia*, the Supreme Court upheld the random, suspicionless drug testing of students involved in extracurricular activities. 515 U.S. 646. *See also Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002) ("'In certain limited circumstances, the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without any measure of individualized suspicion.'") (quoting *Nat'l Treasury Employees Union v. Von Raabe*, 489 U.S.656, 668 (1989)).

Although the level of suspicion required can vary in a school depending on the type of search and the circumstances, there is no question, as noted *supra*, that the law has clearly established that "young people do not 'shed their constitutional rights' at the schoolhouse door." *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (holding that students temporarily suspended from public school have a property and liberty interest that qualifies them for protection under the Due Process Clause) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). More specifically, it is clearly established, at least since *T.L.O.*, that searches of students must be analyzed under the reasonableness standard. *See Phaneuf*, 448 F.3d at 595 (noting that, in *T.L.O.*, "the Supreme Court applied the Fourth Amendment 'reasonableness' standard to a

---

[8] Municipalities, including a Board of Education, "are not entitled to qualified immunity for their actions, even where the individual officers who acted on the municipalities behalf would be." *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 109 (2d Cir. 2006). However, as noted *supra*, the claims against the municipalities in the instant case fail for other reasons.

search of a student by school administrators"); *see also MacWade v. Kelly*, 460 F.3d 260, 267 (2d Cir. 2006) ("As the Fourth Amendment's text makes clear, the concept of reasonableness is the 'touchstone of the constitutionality of a governmental search.'") (quoting *Earls*, 536 U.S. at 828). In other words, "[a]lthough the meaning of 'unreasonable searches and seizures' is different in the school context than elsewhere, it is nonetheless evident that there must be some basis for initiating a search. A reasonable person could not believe otherwise." *Klump v. Nazareth Area Sch. Dist.*, 425 F. Supp. 2d 622, 641 (E.D. Pa. 2006); *see also Greanleaf v. Cote*, No. 98-CV-250 (B), 2000 WL 863217, at *3 (D. Me. March 3, 2000) ("[Student] had a clearly established right to be free from an unreasonable search of her belongings by Defendant"); *Sostarecz v. Misko*, No. 97-CV-2112, 1999 WL 239401, at *5 (E.D. Pa. March 26, 1999) (holding that "*T.L.O.*'s point is clear that school officials are not permitted to unreasonably search a student's person or her belongings" and denying qualified immunity where student was strip searched); *Konop v. Northwestern Sch. Dist.*, 26 F. Supp. 2d 1189, 1201 (D.S.D. 1998) ("The reasonableness standard set forth in *T.L.O.* was clearly established and should have been applied by defendants."). Thus, an individual does not avoid liability for an objectively unreasonable search performed on a student merely because the exact factual scenario presented was not examined and held unconstitutional by prior courts. *See Bell v. Marseilles Elementary Sch.*, 160 F. Supp. 2d 883, 890 (N.D. Ill. 2001) ("Although the law must be clear in the particular factual context at issue for qualified immunity to be inapplicable, this does not mean a case scenario exactly like the one at hand must have been addressed by courts in the past.

Such a rigid requirement would be equivalent to granting school agents absolute immunity and, thus, would swallow the qualified immunity rule. More general similarities are sufficient as long as they provide adequate warning that a particular behavior would be illegal.") (citing *Anderson*, 483 U.S. at 639).

In short, this Court concludes that it was clearly established by the Supreme Court that, at the time of I.M.'s search, searches of students must be conducted under the "reasonableness" standard under the Fourth Amendment. *See, e.g., Phaneuf*, 448 F.3d at 596 (remanding case to district court to determine whether the individual defendants were entitled to qualified immunity after joining sister circuits in concluding that the reasonableness standard announced by the Supreme Court in *T.L.O.* should be applied to strip searches of students and finding that the search at issue lacked the requisite suspicion). Therefore, in the instant case, the Court must examine whether or not if would have been objectively reasonable for the defendants to believe that their conduct in this case comported with the "reasonableness" standard.

As a threshold matter, the Court notes that, although the Court found that the vital signs check, search of I.M.'s person/bag, and the initial drug test were constitutional, defendants would be entitled to qualified immunity on those searches even if such searches had violated the Fourth Amendment. As noted *supra*, the undisputed facts demonstrate that I.M. was caught leaving the school with K.B. in violation of school rules and that I.M. appeared nervous, and was wiping his nose and rubbing his eyes. At the time of the events in this case, it was not clearly established that a vital signs check, search, and saliva-based drug test were

unreasonable under those circumstances. *See e.g.*, *Rhodes*, 54 F. Supp. 2d at 195 (holding that it was not clearly established that defendant's decision to enter students hotel rooms, including plaintiffs', after smelling marijuana in hotel hallway, was a constitutional violation); *Wofford v. Evans*, No. 02-CV-0762 (JLK), 2003 WL 24254757, at *4-*5 (W.D. Va. Sept. 8, 2003) (holding that defendant was entitled to qualified immunity where defendant had questioned plaintiff regarding a gun brought to school, because "case law does not establish the applicable standard to be applied in school seizures – or searches – conducted by law enforcement" and defendant's questioning was reasonable under the circumstances). Based upon existing case law, it was objectively reasonable for defendants to believe that their conduct did not violate plaintiff's rights in performing the vital signs check, physical search of I.M.'s person/bag, and initial drug test. Accordingly, even assuming *arguendo* that these searches were unreasonable, the individual defendants are entitled to qualified immunity.

However, based upon the current record and drawing all inferences in plaintiffs' favor, the Court cannot conclude at this juncture that qualified immunity exists with respect to the three subsequent saliva tests later that day. In particular, if the affidavits of I.M. and K.B. are credited – namely, that I.M. fully complied with the first drug test, I.M. was told by Principal Warren that he had passed the test, K.B. never made a statement to Principal Warren suggesting disbelief that I.M. could test negative for drugs, and there was no new information suggesting drug use prior to the three subsequent tests – then there would have been no basis for Principal Warren to direct that three additional drug tests take place (especially where the vital signs check and the

search of I.M.'s person and belongings also failed to reveal evidence of drug possession or use). In other words, taking I.M.'s version of the facts as true for purposes of this motion, the Court cannot conclude that it was objectively reasonable to require I.M. to submit to three additional drug tests if the first drug test was negative.[9]

Defendants argue that plaintiffs' version of events is so lacking in credibility and common sense that it should be rejected by the Court. For example, defendants argue that K.B.'s affidavit denying making any statement to Principal Warren about I.M. should be disregarded "both as inadmissible hearsay and because it is obviously a self-serving affidavit tailored by plaintiffs to avoid the consequences of other sworn testimony in

---

[9] On remand, the district court in *Phaneuf v. Cipriano*, held that the school officials were entitled to qualified immunity. No. 03-CV-0372 (AVC), 2007 U.S. Dist. LEXIS 5963, at *13. (D. Conn. Jan. 25, 2007), vacated by, in part, claim dismissed by, 2007 U.S. Dist. LEXIS 21193 (D. Conn. Mar. 23, 2007) (holding that state law claims were barred by the doctrine of *res judicata* because defendants had already obtained a favorable judgment in state court when the case was remanded by the Second Circuit). However, the facts in *Phaneuf* are distinguishable from the facts in the instant case because, in *Phaneuf*, defendants received a tip that the student had drugs, the student had a history of discipline problems, and defendants received nominal consent and assistance of the student's mother. *Id.* The Court held that, under those circumstances, it was not clearly established that such actions would be unconstitutional. *Id.* Here, however, viewing the facts in a light most favorable to plaintiff, if the first drug test produced valid negative results, and there was no additional new information, it would not be objectively reasonable to believe that these subsequent drug tests were constitutionally permissible.

this case."[10]  (Defs.' Suppl. Brief, at 6.) Similarly, defendants contend that "IM ascribes in conclusory fashion some malicious motive to Warren and Flynn, but never explains how or why they would harass IM with repeated drug tests, especially when neither even knew IM before this incident." (*Id.* at 8.)  However, the Court cannot resolve these credibility issues on summary judgment; rather, these critical factual disputes, which hinge on the credibility of witnesses, must be resolved by the jury.

Accordingly, defendants' motion for summary judgment, as it relates to the three subsequent drug tests on grounds of qualified immunity, is denied.

6.  Plaintiffs' Procedural Due Process Claim

Plaintiffs' fifth cause of action alleges a procedural due process violation based on the five-day out of school suspension of I.M. as well as the one day in-school suspension of I.M. on October 1, 2004.  Defendants assert that plaintiffs' due process claim must be dismissed for failure to exhaust administrative remedies.  Plaintiffs respond that exhaustion is futile. "Exhaustion of administrative . . . and state law remedies is not 'categorically' required before an individual may resort to

federal court under § 1983." *Koehler v. New York City*, No. 04-CV-6929 (RMB), 2005 U.S. Dist. LEXIS 8901, at *13 (S.D.N.Y. May 11, 2005) (citing *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 516 (1982)) (other citation omitted).  Plaintiffs presently have a claim pending on appeal to the Commissioner of Education for violations of New York Education Law § 3214 for failure to hold an informal conference.[11]  (Pls.' Mem. at 5;

---

[10]  The Court rejects defendants' argument that, although affidavits are permitted in opposing summary judgment motions, the Court should disregard K.B.'s affidavit as inadmissible hearsay because plaintiffs did not seek permission from K.B.'s parents to depose K.B. and, thus, defendants did not get the opportunity to cross-examine K.B. about this affidavit.  The Court finds that plaintiffs' failure to depose K.B. does not provide grounds for disregarding K.B.'s affidavit for purposes of the summary judgment motion.

---

[11]N.Y. Educ. Law § 3214 provides in relevant part:

[T]he principal of the school where the pupil attends . . . shall have the power to suspend a pupil for a period not to exceed five school days. In the case of such a suspension . . ., the suspending authority shall provide the pupil with notice of the charged misconduct. If the pupil denies the misconduct, the suspending authority shall provide an explanation of the basis for the suspension. The pupil and the person in parental relation to the pupil shall, on request, be given an opportunity for an informal conference with the principal at which the pupil and/or person in parental relation shall be authorized to present the pupil's version of the event and to ask questions of the complaining witnesses. The aforesaid notice and opportunity for an informal conference shall take place prior to suspension of the pupil unless the pupil's presence in the school poses a continuing danger to persons or property or an ongoing threat of disruption to the academic process, in which case the pupil's notice and opportunity for an informal conference shall take place as soon after the suspension as is reasonably practicable.

N.Y. Educ. Law § 3214(3).  Plaintiffs' original complaint asserted an independent claim for a violation of N.Y. Educ. Law § 3214.  However, plaintiffs withdrew this claim in their amended

Defs.' Mem. at 8.) The pending proceedings seeks to expunge I.M.'s suspensions. "The exhaustion doctrine prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes." *Heldman v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992). However, the exhaustion requirement does not apply where "pursuit of administrative remedies would be futile because the agency either was acting in violation of the law or was unable to remedy the alleged injury." *Id.*

Here, plaintiffs argue that exhaustion would be futile because the administrative procedures do not provide an adequate remedy. Specifically, plaintiffs argue that because I.M. is a senior and has applied to college – some college applications request information as to suspensions – and because I.M. will have graduated from college before a portion of plaintiffs' claim is determined, given that the Commissioner's decision will be subject to judicial review pursuant to Article 78, the administrative remedies are inadequate.

As a threshold matter, the Court does not believe that plaintiffs have adequately demonstrated futility in failing to satisfy the exhaustion requirement as it relates to their due process claim. However, even assuming *arguendo* that plaintiffs' due process claim is not barred for failure to exhaust administrative remedies, plaintiffs' due process claim fails on the merits as a matter of law for the reasons set forth below.

Plaintiffs' claim stems from a five-day out-of-school suspension and a one-day in-

complaint. (*See* Pls.' Supp. Mem. of Law at 2.)

school suspension – this amounts to a total of six-days of suspension. In *Goss v. Lopez*, the Supreme Court set forth minimal due process requirements as it relates to suspensions of ten days or less. Specifically, the Court held:

> Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

*Goss v. Lopez*, 419 U.S. 565, 581 (1975). "A formal hearing is unnecessary" for suspensions of ten days or less. *Rosenfeld v. Ketter*, 820 F.2d 38, 40 (2d Cir. 1987). "In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Goss*, 419 U.S. at 582. Here, I.M. was suspended for a period of less than ten days. Accordingly, I.M. is entitled to the minimal due process outlined in *Goss*.

On the date of the incident, I.M. was told that he was suspended for disrespecting Principal Warren. (I.M. Aff. ¶ 12.) I.M.'s father was also present when Principal Warren informed I.M. that he was being suspended for insubordination. (Thomas Mac Ineirghe Aff. ¶ 8.) Mrs. Mac Ineirghe also met with Principal Warren on September 23, 2004, the date of the suspension, after her husband had already returned from the school. (Eileen Mac Ineirghe Aff. ¶ 4.) At that time, Principal Warren informed Mrs. Mac Ineirghe that I.M. was suspended for five days for disrespect to the principal (*Id.*)

Neither parent was informed at their respective meetings with the principal on the date of the incident that they had a right to an informal conference. (Thomas Mac Ineirghe Aff. ¶ 13; Eileen Mac Ineirghe Aff. ¶ 8.) Instead, they received notice from the school in the mail on September 27, 2004, four days after the events occurred, informing them that they had a right to an informal conference regarding I.M.'s suspension. (Thomas Mac Ineirghe Aff. ¶ 13; Eileen Mac Ineirghe Aff. ¶ 8.) The same day that Mr. Mac Ineirghe received the notice, he delivered to the school a written notice demanding an informal conference and followed-up the written request with a phone call to the school the next day. (*Id.* ¶ 13.) No conference was ever held. (*Id.*)

Based on the undisputed facts, the Court finds that plaintiffs' due process rights were not violated as a matter of law. Although plaintiffs were not afforded the process described under N.Y. Educ. Law § 3214, plaintiffs were afforded the process due under the Constitution. I.M. and his parents were given oral notice of the reasons for the suspension and I.M. had an opportunity to deny the allegations and present his side of the story in the meeting with Principal Warren. *See Rosenfeld*, 820 F.2d at 40 (holding that "discussions [after the incident] afforded [plaintiff] the opportunity required by *Goss* to characterize his conduct"); *see also McDonald v. Sweetman*, No. 02-CV-1040 (MRK), 2004 U.S. Dist. LEXIS 5558, at *14-*15 (D. Conn. May 24, 2004). ("While [plaintiff] may rightly feel that she was tried, convicted, and sentenced by school officials who had already made up their minds, the fact remains that before she was suspended, [plaintiff] was given oral notice of the charges against her, an opportunity to present her version of the facts, and an explanation,

however feeble, of the evidence against her."). Furthermore, whether plaintiffs received additional due process prior to being placed in the one-day in-school suspension class on October 1, 2004, is of no consequence to plaintiffs' procedural due process claim. I.M. received instruction from a classroom teacher and received his school work while under the in-school suspension. (Warren Aff. ¶ 54-55.) Under *Goss*, due process requirements do not apply where the property interest at issue is "*de minimis.*" *Goss*, 419 U.S. at 576. The liberty or property interest involved in a one-day in-school suspension where the student receives instruction is *de minimis*. *Wise v. Pea Ridge Sch. Dist.*, 855 F.2d 560, 563 n.3 (8th Cir. 1988) ("In-school suspension does not exclude the student from school and consequently a student's property interest in a public education is not implicated. Furthermore, the interference with the student's liberty or property interests is *de minimis* and thus due process is not implicated."); *Laney v. Farley*, No. 05-CV-762 (JBB), 2006 U.S. Dist. LEXIS 13449, at *11-*12 (D. Tenn. Jan. 23, 2006) ("Moreover, it does not appear that any particular process is due under the Constitution where the deprivation at issue – here, a one-day in-school suspension – is *de minimis.*"); *Fenton v. Stear*, 423 F. Supp. 767, 771-72 (W.D. Pa. 1976) (holding no procedural due process violation for a three-day in-school suspension where the student was not deprived of any in-school education). Therefore, there was no constitutional deprivation from the failure to provide additional process prior to the October 1, 2004 in-school suspension. Accordingly, defendants' motion for summary judgment as

to plaintiffs' fifth cause of action is granted.[12]

### D. Battery

Plaintiffs sixth, seventh and ninth causes of action allege battery for the taking of I.M.'s vital signs by the nurse, the physical search of I.M.'s person/bag, and the four drug tests. Plaintiffs cause of action for battery for unauthorized drug testing is premised on a violation of I.M.'s constitutional rights and/or the school's lack of authority in New York to drug test without consent under N.Y. Educ. Law § 917-a. Under New York law, a "battery" is "an intentional wrongful physical contact with another person without consent." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001); *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 363 (2d Cir. 2004) (same). "'To recover damages for battery founded on bodily contact, a plaintiff must prove that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent.'" *Johnson v. Suffolk Cty. Police Dep't*, 665 N.Y.S.2d 440, 440 (N.Y. App. Div. 1997) (quoting *Roe v. Barad*, 647 N.Y.S.2d 14, 15 (N.Y. App. Div. 1996)).

Defendants argue that the contact at issue in this case was neither harmful nor offensive and that it was justified under the circumstances. (Defs.' Br. at 17.) With respect to the vital signs check, the search of I.M.'s person and belongings, and the initial saliva test, such searches cannot be the basis for a state law claim for battery because, for the reasons set forth *supra*, the Court has concluded that those searches were permissible as a matter of law and, thus, were privileged . *See, e.g., Stokes v. City of New York*, No. 05-CV-0007 (JFB), 2007 U.S. Dist. LEXIS 32787, at *50 (E.D.N.Y. May 3, 2007) (dismissing battery claim because reasonable force during lawful arrest is privileged); *Kramer v. City of New York*, No. 04-CV-0106 (HB), 2004 WL 2429811, at *11 (S.D.N.Y. Nov. 1, 2004) (dismissing assault and battery claims based on handcuffing during lawful arrest); *Palmer v. Town of Eastchester*, No. 96-CV-4860 (BSJ), 1997 WL 811536, at *4 (S.D.N.Y. Apr. 9, 1997) (handcuffing and pat-down during lawful arrest was privileged and defeated state law claims for assault and battery).

However, with respect to the three subsequent saliva tests, the same issues of disputed fact as to the Section 1983 claim also preclude summary judgment as to the state battery claim. In other words, if a jury credits plaintiffs' version of events and finds that those subsequent searches violated I.M.'s Fourth Amendment rights, a reasonable jury could also find that such searches constituted an offensive bodily contact warranting liability under state law. In other words, viewing the evidence in a light most favorable to plaintiffs, a reasonable jury could conclude that the three subsequent drug tests, which involved placing a stick in I.M.'s mouth, constitute a battery. *See Sostarecz v. Misko*, No. 97-CV-2112 (AV), 1999 WL 239401, at *11 (E.D. Pa. 1999) (denying defendants' motion for summary judgment on an assault and battery claim stemming from the strip search of a student); *see also Cornett v.*

---

[12] Though plaintiffs do not specify which particular claims they are alleging against each defendant, it appears plaintiffs' only allegation against defendant Smith is the alleged due process violation. Plaintiffs do not point to any evidence demonstrating Smith's involvement in conduct relevant to the other claims. Accordingly, because the Court grants defendants' motion for summary judgment on plaintiffs' due process claim, defendant Smith is dismissed from this action.

*Brown*, No. 04-CV-754 (DGT), 2006 WL 845568, at *16 (E.D.N.Y. March 30, 2006) ("[P]laintiff's assault and battery claims for that arrest will depend, at least in part, upon whether the arrest was lawful, which is a determination that cannot be made upon this record."). Accordingly, defendants' motion for summary judgment on the battery claim as it relates to the three subsequent drug tests is denied.

### E. New York Education Law § 912-a

Plaintiffs' Eighth Cause of Action alleges a violation of New York Education Law § 912-a. Section 912-a governs the testing of students for drugs and contains a number of procedures that school authorities must follow in administering such tests.[13] Defendants argue that there is no private right of action under Section 912-a. Plaintiffs have pointed to no cases in New York, nor is the Court

---

[13] N.Y. Educ. Law § 912-a. Urine analysis; drug detection provides:

1. The school authorities of each school district within the state may cause all children attending grades seven through twelve, inclusive, in the public and private schools located within such districts, to be separately and carefully examined in order to ascertain whether any such children are making use of dangerous drugs.

2. Such examination may be made only upon the written request or consent of a parent of, or person in parental relation to, a child. Such examination shall be conducted without notice to the child and shall include the supervised taking of a urine sample which shall be analyzed for such drugs and in accordance with such standards as shall be acceptable to the New York state office of alcoholism and substance abuse services, or its successor agency. The results of such examination shall be promptly forwarded to the school authorities. If it should be ascertained, upon such test or examination, that any child is making use of dangerous drugs, the school authorities shall report same to the social services department for the social services district wherein such school is located and to the parent of, or person in parental relation to, such child together with a statement to such parent or person in parental relation as to available programs and facilities to combat such dangerous drug usage. The local social services department shall be empowered, in an appropriate case, to take such action and offer such protective social services as are prescribed by title six of article six of the social services law.

3. Except as required in this section, information resulting from an examination conducted pursuant to this section shall be kept confidential and shall not be used for law enforcement purposes but may be utilized only for statistical, epidemiological or research purposes.

4. Any record or information compiled from such examination which identifies an individual student as a user of dangerous drugs shall be maintained separate and apart from such student's other educational records and in appropriate confidence and shall be destroyed upon such student's graduation or final severance from the secondary educational school system in this state.

Notwithstanding any provision of this section to the contrary, no such examination shall be required where a student objects thereto on the grounds that such examinations conflict with their genuine and sincere religious beliefs.

aware of any case authority, finding a private right of action exists under New York law for violating Section 912-a. For the reasons set forth below, the Court concludes that there is no private right of action under Section 912-a.

Under New York law, "[t]o form a special relationship through breach of a statutory duty, the governing statute must authorize a private right of action. One may be fairly implied when (1) the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) recognition of a private right of action would promote the legislative purpose of the governing statute; and (3) to do so would be consistent with the legislative scheme." *Pelaez v. Seide*, 810 N.E.2d 393, 400 (N.Y. 2004) (citing *Sheehy v. Big Flats Community Day*, 541 N.E.2d 18, 20 (N.Y. 1989)). With respect to the first prong, plaintiff, as a high school student, is a member of the class of persons for whose benefit the statute was enacted. As to the second prong, although it is not entirely clear, the Court will assume for purposes of this motion that permitting a private right of action would promote the legislative purpose, which is arguably an attempt to address the prevalence of drugs in schools while also recognizing the need for procedures to ensure that the privacy of students is not being unnecessarily compromised. *Cf. People v. Scott D.*, 315 N.E.2d 466, 468 (N.Y. 1974) (citing N.Y. Educ. Law §§ 912-a and 3028-a and acknowledging that "[t]he dangerous drug prevalence in many schools and in many areas is a significant fact to be considered in determining the scope of reasonableness in making searches").

However, the Court concludes that there is no implied private right of action under Section 912-a because it is not consistent with the legislative scheme and, thus, fails to satisfy the third requirement under New York law for creating an implied right of action. As a threshold matter, the Court notes that the statutory language does not *expressly* provide a private cause of action, nor is there any indication from the language of the statute that the Legislature had such an intent. Moreover, there is absolutely no reason why the procedural requirements contained in Section 912-a could not be fully enforced administratively. In other words, consistent with this legislative scheme, the Commissioner would have the ability to enforce § 912-a and the authority to withhold money under § 912-a if a school was not complying with its requirements. Although that enforcement mechanism was not explicit when the statute was first enacted, the Legislature amended the Act, effective September 1, 2005, to explicitly confer upon the Commissioner the duty to enforce all of the provisions of Article 19. N.Y. Educ. Law. § 911 (eff. Sept. 1, 2005); *see, e.g.*, *Mark G. v. Sobol*, 717 N.E.2d 1067, 1072 (N.Y. 1999) (finding no private right of action where, among other things, "the Legislature's subsequent amendments to the enforcement scheme . . . evinced an emphasis on funding mechanisms and the development of performance standards by the State Department of Social Services"). Therefore, where the Legislature has evinced a clear intent to have the statutory requirements enforced administratively, it would be completely inconsistent with the legislative scheme for this Court to imply a private right of action.

The circumstances in the instant case are analogous to the situation confronted by the New York Court of Appeals in *Uhr v. E. Greenberg Cent. School Dist.*, 720 N.E.2d 886 (N.Y. 1999). In *Uhr*, the court considered whether a statute mandating schools to

perform scoliosis examinations provided for a private right of action. 720 N.E.2d at 888. The Court held that there was no private right of action because it would not be consistent with the legislative scheme. *Id.* at 890. Specifically, the Court recognized that (1) "[t]he Legislature . . . expressly charged the Commissioner of Education with the duty to implement [the law] and has equipped the Commissioner with authority to adopt rules and regulations for such purpose (*see* Education Law § 905[1]], § 911)"; (2) "the Legislature has vested the Commissioner with power to withhold public funding from noncompliant school districts"; and (3) the Legislature amended the statute in response to a case that denied liability where a school district failed to administer the scoliosis tests, but did not amend the statute to provide for a private cause of action. *Id.* at 890-91.

In the instant case, as in *Uhr*, the Legislature has expressly charged the Commissioner of Education with the duty to implement the law and there is nothing to suggest that a private right of action is necessary to, or even consistent with, this statutory framework. *See, e.g., Pelaez v. Seide*, 810 N.E.2d 393, 401 (N.Y. 2004) ("While a private right of action might, at least indirectly, promote the ultimate legislative purpose – reducing lead paint hazards – and thus satisfy the second *Sheehy* prong, it does not comport with the legislative scheme."); *Carrier v. Salvation Army*, 667 N.E.2d 328, 330 (N.Y. 1996) ("[R]egardless of its consistency with the basic legislative goal, a private right of action should not be judicially sanctioned *if it is incompatible with the enforcement mechanism chosen by the Legislature.*") (quoting *Sheehy*, 541 N.E.2d 18 (emphasis added)). Thus, given these circumstances, the Court declines to improperly usurp the role of legislature by

implying a private right of action where none exists from the language of the statute. *See Mark G.*, 717 N.E.2d at 1071 ("The Legislature has the authority to determine whether opening the statute to private tort law enforcement would advance the objectives of child and family welfare or skew the distribution of resources. Considering that the statute gives no hint of any private enforcement remedy for money damages, we will not impute one to the lawmakers."); *see also Riegel Textile Corp. v. Celanese Corp.*, 649 F.2d 894, 901 (2d Cir. 1981) ("To be sure, implication of a private right of action would provide an additional enforcement tool; however, it is not our role to legislate. 'The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law.'") (quoting *Touche Ross & Co. V. Redington*, 442 U.S. 560, 578 (1979)). Accordingly, defendants' motion for summary judgment on the Section 912-a claim is granted.[14]

---

[14] Even assuming *arguendo* that there were a private right of action under Section 912-a, there is absolutely nothing in the statute to suggest that it was designed to create such a right under the circumstances of this case where the test was not administered pursuant to some generalized testing of students, but rather was based on reasonable suspicion. Specifically, the plain language of the statute indicates that it applies to suspicionless drug tests of all students, which is not the case here. Moreover, the statute refers to urine analysis and establishes procedures for such testing of students. It does not provide any requirements or procedures for saliva-based drug tests of students. In short, even if a private right of action exists under Section 912-a, it does not apply to the circumstances of this case and, thus, the claim is also dismissed on this separate ground.

IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to all claims stemming from the initial search, nurse examination and drug test, plaintiffs' due process claim and plaintiffs' claim pursuant to N.Y. Educ. Law § 912-a. Defendants' motion for summary judgment is denied as to plaintiffs' Fourth Amendment and battery claims stemming from the three additional drug tests.


SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 22, 2007
Central Islip, NY

* * *

The attorney for plaintiffs is James V. Fallon, Jr., Esq., of Fallon and Fallon LLP, 53 Main Street, Sayville, New York 11782-1423. The attorneys for defendants are Daniel L. Adams, Esq., and Christopher J. Mullane, Esq., Rutherford & Christie LLP, 300 East 42nd Street, New York, New York 10017.